

# THE ATTORNEY GENERAL
## OF TEXAS
### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

June 30, 1947

Honorable George B. Butler, Chairman,
Board of Insurance Commissioners,
Austin, Texas

Opinion No. V-279

Re: Whether specimen
copies of policy
forms of life and
health and acci-
dent insurance are
consistent with
and not prohibited
by Section 11 of
Article 4859f,
V. C. S.

Dear Sir:

Your request for an opinion is as follows:

"Southern Medical Hospital Service is
licensed under the provisions of Chapter 8a,
Title 78, as amended, and Article 5068-1 to
5 inclusive, of Vernon's Texas Civil Stat-
utes.

"Will you please advise me whether the
attached forms of policy prepared by South-
ern Medical Hospital Service is consistent
with and not prohibited by Section 11 of Chap-
ter 8A."

Southern Medical Hospital Service is a state-
wide mutual assessment company issuing life, health and
accident policies. According to the charter of the com-
pany, as amended in 1933, the purpose is stated as fol-
lows:

"The purpose of the corporation is and
shall be the creation, operation and main-
tenance of a mutual insurance association,
on what is known as the statewide assessment
plan, for the protection, indemnification,
and insurance of the lives of its members and
against loss to them by reason of ill health
and/or accident."

The 43rd Legislature in 1933 passed House Bill No. 303, Chapter 245, page 856, which regulates mutual assessment associations engaged in issuing policies or certificates of life insurance. This bill has become known as Article 4859f, V. C. S. The 46th Legislature in 1939 passed Senate Bill No. 135, Chapter 6, page 401, which is now known as Article 5068-1, V.C.S. The scope of this Act embraced all mutual assessment companies and associations issuing certificates of life as well as health and accident certificates. Section 9 of Article 5068-1 contains the following provisions:

"All certificate forms hereafter used must be in accord with the provisions of this Act and with all other laws regulating such associations as are embraced in this Act."

Article 5068-1 does not repeal any laws relating to mutual companies, except those in conflict with it. Obviously, the Article is an effort by the Legislature to clarify and harmonize the laws governing mutual assessment companies. The above quoted provision of Article 5068-1 permits Section 11 of Article 4859f to cover not only life policies but health and accident as well.

The pertinent part of Section 11, Article 4859f, provides:

"No corporation hereunder shall issue any certificate or policy upon a limited payment plan, nor guarantee or promise to pay any type of endowment or annuity benefits, but shall confine its operation to the issuance of certificates looking to continuous payment premiums or assessments during the life time of the policyholder. And provided further that no such corporation shall issue any certificate or deposit agreeing to pay any benefits until a copy of such certificate or policy has been filed with the Board of Insurance Commissioners and approved by them as being in compliance with this Act."

One of the policy forms submitted is entitled "Hospitalization, Medical Care and Surgery with 20 Year Pay Participating Reserve," which shall hereafter be referred to as health policy. The other is entitled "Fam-

ily Group Life Policy ____ Year Pay," hereinafter
called life policy.

The health policy calls for an advance pre-
mium payment by the first insured of _____ dollars
and a like amount on the _____ day of _____ thereafter
for a period of 20 consecutive years from date of issue.
The Service agrees to create and maintain an amount not
to exceed _____ dollars as a 20 year participating
reserve. The certificate contains provisions concern-
ing the manner of establishing the value of the reserve
and further provides under "Conditions and Privileges"
for extended insurance, a schedule of 20 year pay par-
ticipating reserve,and the manner in which the assured
may withdraw the amount of the participating reserve.
The funds of this reserve may be withdrawn in a lump
sum at any time while the policy is in force, or extend-
ed as retirement income for a period of 120 months. The
sum withdrawn is less indebtedness, which according to
the policy shall include any obligation of the insured
on the policy or reserve; all benefits paid during the
term of the policy; all premium payments made by the Ser-
vice on behalf of the assured for extended insurance; and
all unpaid due premiums. Another feature contained in
this policy is that after the expiration of 20 years, if
continuous premiums have been paid by the insured, the
policy may remain in force with a further premium payment
of $1.00 per year. If the assured withdraws the cash in
the participating reserve fund, it shall be in lieu of
all other benefits and all liability of the Service shall
cease. This policy further provides that no extra as-
sessments will be made upon the assured, and that the pol-
icyholder's liability is to the extent of the premium
rates shown on the face of the policy.

The life policy form calls first for the pay-
ment of an advanced premium and a like amount on or be-
fore _____ day of each month thereafter for _____ full
years and a further payment of $1.00 a year thereafter
so long as the policy is in force. The policyholder's
liability for premiums is the same as that contained in
the health policy. This policy carries provisions re-
lating to settlement; cash withdrawal value; loan value;
cash value of the reserve, and extended insurance. Con-
cerning cash withdrawal value, the company agrees to pay
in cash not later than 60 days after legal surrender of
the policy, the matured reserve shown under "Schedule of
Cash Value of the Reserve" less indebtedness (not de-
fined by this policy). This payment is made subject to

a deduction of death benefits paid under the policy. The Service further agrees to advance to the last surviving insured, if he so desires, a loan of all or any part of the sum shown by the Schedule of Cash Value of the Reserve, subject to deductions of all indebtedness. The loan shall bear interest at the rate of 6% per annum payable in advance. Failure to repay such a loan will not void the policy until the indebtedness shall equal or exceed its loan value. Under extended insurance, the Service agrees to pay any premiums which the insured does not pay, such payments to be made out of the cash value of the reserve; and will be made for the insured until the funds in the cash value of the reserve are exhausted.

In the case of Banker's Life and Loan Association vs. Chase (Court of Civil Appeals), 114 S.W. (2d) 374, writ dism., we have found the only construction of Section 11, Article 4859f, made by any of the Courts in Texas. The Court said, after quoting the first part of Section 11:

"The limitation contained in this section, we think, is a limitation on the time and method of payment rather than on the amount the insurer must pay under the policy; a restriction confining it to the issuance of certificates of ordinary insurance."

The Court then defines limited payment plan, endowment insurance and annuity insurance as follows:

"37 C. J., page 362, par. 6, is as follows: 'Endowment insurance is a contract to pay a certain sum to insured if he lives a certain length of time, or, if he dies, before that time, to some other person indicated. * * *'

"'Annuity insurance is a contract to pay the insured or the beneficiary a sum for a certain period or during life.' Couch, Cyclopedia of Insurance Law, Vol. 1, page 38, par. 25.

"A policy upon a limited payment plan, as we understand, is a paid-up policy, and insurance upon which no further

premium is to be paid.   37 C. J., page
364, par. 11."

Under the Court's definition of endowment
insurance, we conclude that neither of the policies
attempts to "promise or guarantee the payment of en-
dowment benefits." The definition makes it plain that
the amount to be paid shall be certain and that the
contract must be for a certain length of time. Nei-
ther of these policies contracts to pay a certain sum;
rather, the sum is indefinite and uncertain. The
health policy establishes the value of the reserve by
setting aside a sum not to exceed 5% of the earned in-
come during the preceding year. The income of the
company will, by the very nature of the business, vary
from year to year. In some years there may not be any
earned income, in which event, it is stated in the
policy that the deficit shall be prorated to each pol-
icy holder's schedule of the value of the reserve as
his interest appears. And if the company is unable to
establish the value within 5 years after a deficit oc-
curs or within the 20 years, the Service shall be re-
lieved of the liability to make adjustments. This man-
ifestly renders the sum to be paid the insured from
the participating reserve fund indefinite and uncer-
tain and cannot be said to constitute endowment insur-
ance.

The same reasoning answers an objection
that the life policy is a type of annuity insurance.
But the health policy, wherein it provides for the pay-
ment of whatever sum has accumulated in the reserve
fund as a retirement income for a period of 120 months,
is a type of annuity insurance under the definition a-
bove. We hold that this policy violates the provisions
of Section 11 prohibiting the issuance of policies with
a promise to pay any type of annuity insurance.

Aside from the questions raised by the pro-
visions of the policy relating to endowment and annuity
insurance, the provision of Section 11 of the statute
which more strongly indicates the intention of the Leg-
islature in the regulation of mutual companies is:

" . . . but shall confine its op-
eration to the issuance of certificates
looking to continuous payment premiums
or assessments during the lifetime of the
policyholder."

As the Court said in the Chase case, supra:

>   " . . . a restriction confining
> it to the issuance of certificates of
> ordinary insurance."

According to the definition of "ordinary insurance"
found in 44 C. J. S., page 487, Section b, par. 27,
it is:

>   "Where the insurance is on a lev-
> el or flat rate plan, that is, where
> for a fixed premium payable, without
> condition, at stated intervals, a sum
> certain is to be paid on death without
> condition, it is known variously as
> 'general insurance','ordinary insurance',
> 'old-line insurance', or 'level-premium
> insurance', even though insurer is doing
> business on the assessment plan, and pay-
> ments to be made by insured are desig-
> nated as assessments."

Measured by this standard, these policies
not only contract to pay death and health benefits,
but also contract to pay the assured the amount accum-
ulated in the special reserve fund, even though the
assured has not sustained a loss under the policy.
These provisions setting up the participating reserve
fund on the basis of a 20 year pay program, cash with-
drawal value, loan value and extended insurance, are
in addition to a contract of ordinary insurance. In
other words, by the creation of this special reserve
fund, in addition to covering the assured for either
life or health, the policies have not remained within
the bounds of the limitations prescribed by the Legis-
lature. Neither can such provisions be reconciled
with the purpose of the company as is stated in the
charter quoted above. The life policy itself is en-
titled "_____ year pay life", and the health policy
carries with it a twenty year pay participating re-
serve on a premium plan exactly as the life policy.
It is true that ordinary policies of life insurance
set up schedules of reserve values relating to cash
surrender values, and some of them may possibly pro-
vide for similar features carried by the health and
life policies. There is a fundamental difference,
however, between an ordinary policy of life insurance
and these policies in the manner of establishing the

reserve. An ordinary life policy establishes the re-
serve upon the basis of the actual premium paid by the
assured. These policies establish the reserve by set-
ting aside each year a certain amount of the earned in-
come from all of the policies containing such provis-
ions. The value thus created may, depending upon the
amount of earned income, far exceed, or be much less
than, a reserve value established upon the basis of an
individual's premium. The policyholders are sharing
in the proceeds derived from other policies and in this
way take on some of the characteristics of tentine in-
surance, which is not necessary to discuss here. In
any event, these forms are different from ordinary in-
surance and additional evidence that the company has
exceeded the limitation declared by the Legislature in
Section 11 of Article 4859f, and by the Court in the
Chase case, supra.

It is obvious that before this company
could be financially able to establish such a reserve
fund as contemplated by these policies, it would, of
necessity, be forced to charge a premium in excess of
a premium on an ordinary policy. This must have been
carefully considered by the company when provision was
made to charge the assured only $1.00 per year after he
had paid regular premiums for twenty years and still
carry the policy in force. The solvency of the company
could not survive otherwise. This is doing nothing more
than issuing a policy on what is known as a twenty year
plan. For all practical purposes the assured has com-
pleted the payment of what can be termed regular prem-
iums at the end of twenty years, and his obligation to
pay $1.00 per year after such time does not meet any
standard of premium charge based upon losses. Certain-
ly this is true if the premium paid for twenty years be
considered an adequate premium to meet losses and ex-
penses during such period. It amounts to nothing more
than a token payment -- a flaccid attempt to meet the
statutory requirement of "continuous collection of prem-
iums or assessments during the lifetime of the policy-
holder." Were it not for this requirement in the stat-
ute, there would be no need whatever under this plan of
insurance to call for further collection of $1.00 prem-
ium at the expiration of the participating period. The
policies, then, are actually "paid up" policies at the
end of the participating period; and, come within the
definition of "limited payment plan" adopted in the Chase
case, supra. They are in violation of the express pro-
hibition against issuing any certificate or policy on a

"limited payment plan".

Where no express authority is to be found in either the charter or the statutes permitting a mutual assessment company to issue policies of this nature, the rule is that such policies are ultra vires. This rule is well expressed on page 635, par. 256, Couch, Cyclopedia of Insurance Law:

> "The measure of the powers of mu-
> tual companies or benefit societies to
> contract whether they be voluntary or-
> ganizations or incorporations is found
> in their charters or articles of asso-
> ciation, since these constitute their
> fundamental and organic law, the compact
> governing their acts, subject to the
> Constitution and laws of the State. This,
> of course, means that such companies and
> societies have only such powers as are
> therein specifically enumerated, togeth-
> er with such others as are incidental,
> or necessary, to carry the express pow-
> ers into effect, and necessary to the
> enjoyment of the rights and privileges
> included in the original authorization.
> And, of course, acts which do not fall
> within such express or implied powers
> are ultra vires and void; and where an
> act is ultra vires, the motive which
> prompted it is not of great importance."

We have found no cases either in or out of Texas construing similar policy forms under statutory prohibitions such as we have here. However, in Vol. 128, A. L. R., page 639, we find this general rule:

> "Provisions for extended or paid-
> up insurance or for loan or surrender
> values or endowment provisions doubt-
> less cannot be included in life policies
> issued by companies operating strictly
> and exclusively on the assessment plan,
> because in such case, the assessments
> being limited to the amount necessary to
> pay death claims, no reserve fund can be
> accumulated with which to fulfill such
> provisions. Companies doing business
> under this strictly assessment plan

possess no power to require the pay-
ment of fixed assessments or premiums
at stated periods, regardless of the
current mortuary claims against the
company, and it is the lack of this
power on the part of a life insurance
company that precludes it from put-
ting such provision in its policies.
There are, however, many assessment
plans of doing life insurance busi-
ness, under some of which companies,
dependent upon the statutes under
which they are organized, possess the
power to fix a premium that will cre-
ate a reserve fund to pay for <u>ex-
tended</u> or <u>paid-up insurance</u> or <u>endow-
ments</u>, and <u>which will give</u> to their
policies a loan or surrender value."
(Emphasis ours.)

Our statute contains no language, either ex-
pressly or impliedly, giving such companies a right to
issue policies with provisions for loan or cash with-
drawal values or a participating reserve fund.  The very
nature of the plan upon which this company operates is
founded upon the levying of assessments limited to the
amount required to pay losses and operating expenses.
Section 11 of Article 5068-1 apparently recognized this
very principle when it provides:

"Each association shall levy reg-
ular and periodical assessments by what-
ever name they may be called.  These as-
sessments must be in such amounts and at
such proper intervals as will meet the
reasonable operating expenses of the as-
sociation, and pay in full the claims a-
rising under its certificates. . . ."

We believe after a thorough examination of
both policies in the light of Section 11 of Article
4859f, Article 5068-1, and the charter purposes of this
company that both the life and health policies are ultra
vires and prohibited by Section 11, Article 4859f.

## SUMMARY

Where the certificates or policies of a mutual insurance company operating on the mutual assessment plan for the protection, indemnification, and insurance of the lives of its members and against loss to them by reason of ill health and/or accident, contain provisions for the creation of a participating reserve fund on the basis of a twenty year period, together with cash withdrawal value, loan value, and extended insurance features, such policies are inconsistent with and prohibited by the provisions of Section 11, Article 4859f and Article 5068-1 V. C. S.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Charles E. Crenshaw
Assistant

CEC:rt:wb

APPROVED:

ATTORNEY GENERAL